**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JEFFREY A. TEDRICK**

        **Plaintiff,**

                                            **Civil Action 2:09-cv-00763**
**vs.**                                               **Judge John D. Holschuh**
                                               **Magistrate Judge E.A. Preston Deavers.**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

Plaintiff, Jeffrey A. Tedrick, brings this action under 42 U.S.C. §405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security disability insurance benefits. This matter is before the Magistrate Judge for a report and recommendation on Plaintiff's Statement of Errors (Doc. 11) and the Commissioner's Memorandum in Opposition. (Doc. 18).

On December 16, 2003, Plaintiff, at the age of 44, filed his application for DIB, alleging that he has been disabled since October 1, 2001, by reason of depression, high blood pressure, numbness to his arms and hands, dislocation of anterior humerus left shoulder, cervical sprain, and herniated discs at C3-4, C4-5, C5-6 and C6-7. (R. at 103-05; 133.) Plaintiff's application was denied initially and again upon reconsideration. (R. at 69-79.) Plaintiff requested a *de novo* hearing before an administrative law judge ("ALJ"). (R. at 80.) His last insured date for disability insurance benefits was December 31, 2006. (R. at 109.)

ALJ Thomas McNichols held two hearings, on May 10, 2006 and June 12, 2007, at

which Plaintiff, represented by counsel, appeared and testified. (R. at 641-63; 691-708.)  A

medical expert (R. at 663-73; 708-14) and a vocational expert also testified. (R. 673-80; 714-20.)

On July 31, 2007, the ALJ issued a decision finding that Plaintiff was not disabled within the

meaning of the Act.  (R. 41–61.)  Further, the ALJ found that Plaintiff could not perform his

previous work, but found that he retains the ability to perform work at a limited light exertional

level. (R. at 55.)  On July 8, 2009, the Appeals Council denied Plaintiff's request for review and

adopted the ALJ's decision as the Commissioner's final decision. (R. at 6-8.)

Plaintiff then timely commenced the instant action.

## II.    PLAINTIFF'S TESTIMONY

Plaintiff was born May 10, 1959. (R. at 59, 103.)  He has a tenth grade "limited"

education and past work experience as a construction laborer and as an oil drilling laborer. (R. at

134, 139, 155-62.)

At the administrative hearings, Plaintiff testified that he stopped working following an

accident where he fell off a ladder onto his left shoulder. (R. at  644-45, 693.)  He tore his rotator

cuff.  Plaintiff also testified that despite two surgeries, he still had pain in both shoulders and

numbness in both arms and spasms in his neck, strength problems and range of motion problems.

(R. at  647, 650, 693.)  He had numbness and pain in both shoulders and trouble raising his arms

over his head. (R. at  645-46, 694.)  He rated his shoulder pain as 7-8 out of 10. (R. At 653.)  He

has problems swallowing. (R. at 646.)  His throat swells up sometimes, making it hard for him to

breathe; he becomes short of breath daily. (R. at 702, 705.)  He has muscle spasms, the number

of which varies from day to day, on both sides of his neck..

Plaintiff takes Valium and pain medications help to relieve his pain and help him make it

through the day. (R. at 649, 652, 699-700.) He denied side effects from his medications. Plaintiff's most comfortable position is in a recliner or lying down. (R. at 653.) He spends about one-third to one-half of his day in the recliner. (*Id.*)

Plaintiff also testified that he was depressed because he had not been able to go back to work, but that he was not receiving any counseling because he did not have insurance. (R. at 648, 650.)

He testified that he cannot walk very far, approximately from the parking lot to the hearing room. (R. at 701.) He can stand for 15 to 20 minutes and sit for 20 to 30 minutes, each at a time. (R. at 702-03.) Plaintiff stated that he can use his arms, hands and fingers so long as they are in front of him. Plaintiff testified that he could button his shirt, hold a pen, and lift half a gallon of milk. (R. at 655.) He can lift as much as 10 pounds, using both hands. (R. at 703.) He can climb steps using a handrail. He can use his left hand and fingers to a certain extent. He has some difficulty picking up change with his right hand and usually scrapes the coins off the table into his hands. (R. at 661.)

Plaintiff has a driver's license and drives a little each day. (R. at 692.) Plaintiff lives in a mobile home by himself. He testified that he eats a lot of TV dinners. (R. at 703.) He does laundry and occasionally washes the dishes. (*Id.*) He explained that he has a friend who helps him. (*Id.*) He goes to the grocery and the drug store. (R. at 657, 703.) Plaintiff goes to church at least two to three times a month. (R. at 704.) He visits his brother, and he visits his mother two to three times a month. (R. at 657, 704.) Plaintiff testified that he likes to get in the sun, stating that it relieves the pain a little. He fishes while sitting on the bank outside his house some. (R. at 704.) He eats soft food because it takes longer to get it down otherwise. (R. at 656, 705.) He

3

drinks alcohol only occasionally.  Typical daily activities include watching television, reading the newspaper, and walking a little and trying to stretch. (R. at  643, 657-60, 706.)

### III.    MEDICAL RECORDS

Following his back injury at work in November 2000, Plaintiff was initially evaluated in the Emergency Room. (R. at 211-16.)  The emergency room treating physician reported "noted deformity" of the left shoulder and "a markedly decreased range of motion." (R. at 211.)  X-rays showed "anterior dislocation of the humeral head" (*Id*.)  Plaintiff's shoulder was reduced and post-reduction films showed good alignment. (R. at 212.)  Following the reduction, Plaintiff began complaining of some pain in the cervical spine.  X-rays of the cervical spine revealed marked degenerative changes in C-5 and C-6. (*Id*.)  Plaintiff was diagnosed with strain/sprain of the cervical spine and dislocation with reduction of the left shoulder. (*Id*.)

**TREATING PHYSICIANS**

**A.    Steven Kimberly, M.D.**

Plaintiff followed-up with Dr. Kimberly, who prescribed medication, physical therapy and ordered an MRI. (R. at 296-98.)  The MRI taken of Plaintiff's left shoulder confirmed a left rotator cuff tear. (R. at 307-08.)

In February 2001, Plaintiff underwent shoulder surgery to repair his left rotator cuff with Dr. Kimberly, and it resulted in a "fairly solid" repair. (R. at 217-20, 275, 292, 307.)  Plaintiff made good progress with post-surgical physical therapy. (R. at 221-25, 249, 253, 261, 264, 269-73, 275, 277.)

Plaintiff continued to see Dr. Kimberly for post-surgical follow-ups through March 2002.

4

(R. at 233-34, 243-45.)

A left shoulder MRI taken on February 22, 2002 showed post-surgical changes and tendinosis associated with the rotator cuff repair and degenerative arthritis in his shoulder, with thickening in one of its ligaments. (R. at 305-06.)  Dr. Kimberly recommended a neurological consultation. (R. at  239.)

A cervical spine MRI taken on March 15, 2002, showed herniated discs at C3-4, C5-6, and C6-7. (R. at 303-04.)

**B.      Brian Higgins, D.O.**

Plaintiff treated with Dr. Higgins approximately every three months, from May 28, 2002 to April 15, 2005. (R. at 367-416.)  Initially,  Plaintiff had decreased (3/5) strength in his left abductor, but otherwise full and equal strength throughout. (R. at 411-14.)  Dr. Higgins diagnosed dislocation of left humerus closed, rotator cuff tear in left shoulder, neck strain, and herniated discs at C3-4, C5-6, and C6-7. (R. at 413.)  Dr. Higgins recommended further testing and physical therapy. (*Id.*)

On October 3, 2002, Plaintiff underwent electromyographic ("EMG") testing, which showed right C-5 and left C-7 radiculopathies and carpal tunnel syndrome. (R. at 408-09.)  On November 7, 2002, Dr. Higgins reported that Plaintiff could not return to his past employment in the building and trade industry.  Dr. Higgins opined that Plaintiff would require a more sedentary position that did not involve lifting or a job where his the need to walk is restricted. (R. at 405.) On February 3, 2003,  Dr. Higgins reported that Plaintiff was doing reasonably well and he estimated that Plaintiff could return to work in April. (R. at 402.)  On March 6, 2003, Dr. Higgins recommended cervical epidural steroid injections. (R. at 400.)  Plaintiff underwent

epidural injections in May 2003. (R. at 317-18, 321-24.)  Cervical spine x-rays taken on August

30, 2004, showed post-surgical changes with bony hypertrophy in the inferior right neural

foramina. (R. at 430.)  On September 22, 2004 Dr. Higgins adjusted Plaintiff's medications. (R.

at 372.)  On November 3, 2004, Plaintiff underwent EMG and nerve conduction studies, which

showed chronic cervical poly-radiculopathy and carpal tunnel syndrome. (R. at  427.)  Levels C-

5 through T-1 showed some neuropathic changes. (*Id.*)

Plaintiff saw Dr. Higgins on April 15, 2005, one month after surgery to have a bone graft

stimulator implanted, and reported a lowest pain level of 7, an 8 at time of exam, and 10 out of

10 at its worst, since beginning with the stimulator.  (R. at  367.)  Examination revealed

tenderness to the cervical paraspinal muscles posteriorly, with no evidence of muscle atrophy.

Dr. Higgins noted that Plaintiff's discs were not completely fused. (*Id.*)  Dr. Higgins reported, "I

think some of the pain he is noticing increased may be from the [stimulator's] magnetic field."

(*Id.*)  Dr. Higgins opined that Plaintiff had not reached Maximum Medical Improvement

("MMI") because he just began with the spinal cord stimulator.  Dr. Higgins diagnosed Plaintiff

with pseudoarthrosis. (*Id.*)  Dr. Higgins opined that Plaintiff was not able to return to work at

that time. He recommended physical therapy. (*Id.*)

**Robert Crowell, M.D.**

Plaintiff treated with Dr. Crowell from July 10, 2003 through June 16, 2005.  (R. at 417-

42.)  Initially, Plaintiff's examination showed give-way weakness through multiple muscle

groups of the upper extremities that did not fit any dermatomal pattern. (R. at  436-38.)  Dr.

Crowell recommended surgery on Plaintiff's cervical spine. (*Id.*)

A cervical spine MRI, taken on November 14, 2003, showed progression of disc

6

protrusions at C3-4, C5-6 and C6-7, with significant spinal stenosis. (R. at 441-42.)

On March 8, 2004, Plaintiff underwent anterior cervical discectomy at C5-6 and C6-7; cervical fusion at C5-6 and C6-7; plate fixation along C5-6 and C6-7; and a bone graft placed at C5-6 and C6-7. (R. at 339-41.)  Plaintiff saw Dr. Crowell on March 16, 2004, for an initial post-operative follow-up.  Dr. Crowell advised Plaintiff against overhead reaching or lifting more than 10 pounds. (R. at  433.)

A CT scan of the cervical spine taken on October 15, 2004, revealed normal alignment, status-post fusion from C5-C7. (R. at 428.)  The CT scan also revealed unconvertebral spurring, especially at C3-4, where there was some mild neural foraminal impingement. (*Id*.)

On November 16, 2004, Dr. Crowell recommended an external electrical bone growth simulation. (R. at 424.)

A CT scan of the cervical spine taken on June 3, 2005, showed generalized cervical spondylosis and mild scoliosis; Plaintiff's disc spaces remained delineated, and there was mild right lateral canal narrowing at C5-6 secondary to osteophytic spurring. (R. at 418.)

Dr. Crowell confirmed on June 16, 2005, that Plaintiff's fusion surgery was not yet solid. (R. at 417.)  Dr. Crowell further reported that there was "a sense of recurrent numbness affecting the right arm," as well as "limitation of the left shoulder range of motion" resulting in "pain with full abduction and markedly positive left-sided impingement sign." (*Id.*)

**Mark White, D.O.**

Plaintiff's examination by Dr. White on June 21, 2005, revealed full strength throughout, and no atrophy. (R. at 565-68.)  Dr. White recommended further diagnostic testing, with the possibility of another surgery. (R. at  566.)

7

A CT scan of the cervical spine taken on July 12, 2005, showed post surgical changes with intact hardware (R. at 562-64.)  The bone graft material did not appear entirely fused, although there were areas of at least partial fusion. (*Id.*)  There were multilevel degenerative changes of the cervical spine, with moderate spinal stenosis at C3-C4, C4-C5 and C5-C6 and mild stenosis at C6-C7. (R. at 563-64.)

On August 24, 2005, Plaintiff underwent surgery with Dr. White, which included exploration of the prior fusion; removal of the plate at C5-C6 and C6-C7; subsequent takedown of pseudoarthrosis at C5-C6 and C6-C7; partial corpectomy of C5-C6 and C6-C7; decompression of C5-C6 and C6-C7; subsequent interbody fusion using allograft with BMP2 protein at C5-C6 and C6-C7; partial corpectomy of C4, with decompression of C4-C5; and excision of herniated disk with interbody fusion using graft with BMP2 protein and subsequent anterior plate fixation. (R at 519-29.)  Pre- and postoperative diagnoses were severe cervicalgia; right upper extremity radiculopathy secondary to pseudoarthrosis, C5-C6, C6-C7, with spur at C5-C6 causing foraminal stenosis; and herniated  disk, C4-C5, foramina on the right. (R. at 520–24.)

Post-operatively, Plaintiff developed severe neck swelling and dysphagia. (R. at 480-518.)  He went to the emergency room on August 29, 2005.  A CT scan of the neck showed a postoperative fluid collection and deviation of the esophagus and hypopharynx. (R. at 546-47.)  Exploratory surgery revealed a hematoma and a deeper seroma; these were evacuated, and a drain was placed. (R. at 480–82.)  Plaintiff was intubated and placed on ventilator for airway protection.  His condition gradually improved. (R. at 534-55.)

On October 25, 2005, Dr. White reported that Plaintiff was still "having some mild swallowing difficulties, specifically with dry substances, but overall, his swallowing is much improved." (R. at 556.)  Dr. White reported that Plaintiff was still experiencing numbness and tingling in his right arm "but the severe radicular symptoms have resolved." (*Id.*)  Dr. White also noted that Plainiff had posterior interscapular pain from C-3 to C-7. (*Id.*)

On December 11, 2006, Plaintiff saw Dr. White and had intact strength; Dr. White obtained cervical spine x-rays that showed the fusion to be completely solid, with no evidence of instability or facet arthropathy. (R. at  617.)  Dr. White opined that there was nothing from a neurosurgical standpoint that could be done for Plaintiff's continual pain, and released Plaintiff from his care. (*Id.*)

**Brant Holtzmeier, D.O.**

Plaintiff treated with Dr. Holtzmeier from May 18, 2005 to at least May 14, 2007. (R. 569-82, 599-605, 619-24, 635-36.)  On January 17, 2006, Dr. Holtzmeier reported that Plaintiff could not sit, stand or walk for a full eight-hour work day. (R. at  570–71.)  Dr. Holtzmeier also reported that Plaintiff could use his hands for simple grasping, but not for pushing and pulling nor for fine manipulation. (*Id.*)  Dr. Holtzmeier further reported that Plaintiff was not able to squat, crawl, or climb ladders; not able to reach above shoulder level. Plaintiff would likely deteriorate if placed under stress, particularly stress associated with a job. (*Id.*)  Dr. Holtzmeier concluded that Plaintiff's pain could intensify if unable to take frequent periods of rest. (*Id.*)  Dr. Holtzmeier opined that Plaintiff was capable of lifting and carrying one to five pounds occasionally and six to ten pounds rarely. (R. at 575.)

Dr. Holtzmeier also opined as to Plaintiff's mental functioning. (R. at 572-74.) Dr. Holtzmeier reported that Plaintiff's pain limited his ability to interact with others. (*Id.*) Dr. Holtzmeier also opined that generally, Plaintiff was mildly limited in social interaction, extremely limited in sustaining concentration and persistence, and mildly limited in adapting to work settings and changes (*Id.*)

**Michael Sayegh, M.D.**

Plaintiff treated with Dr. Sayegh at the Pain Management Clinic from January 16, 2006 to at least April 26, 2007. (R. at 594-98, 625-34, 637-38.) Initially, Plaintiff reported he was in severe pain. (R. at 597.) Upon examination, Plaintiff's motor functions were intact. (*Id.*) Dr. Sayegh prescribed medication. Dr. Sayegh's treatment focused on prescription medications and epidural steroid injections. (R. at 594-95, 629, 631-34.) In October 2006, Plaintiff saw Dr. Sayegh and reported that the cervical epidural steroid injections improved his symptoms. (R. at 626.)

**BUREAU OF WORKERS' COMPENSATION PHYSICIANS**

**A.      David Ashcraft, D.O.**

On December 27, 2001, examining physician, Dr. Ashcraft, found left shoulder weakness due to mild atrophy, and impingement of the rotator cuff and biceps muscle. (R. at 226-27.) Plaintiff had atrophy in his left biceps, due to the prior surgery. (*Id.*) Plaintiff's muscle testing in his left shoulder was 4/5. (*Id.*) Dr. Ashcraft opined that Plaintiff was under a "29% whole person permanent partial disability" (*Id.*).

**B.      E. Gregory Fisher, M.D.**

On January 14, 2003, examining physician, Dr. Fisher, reported that pain over the right

side of Plaintiff's neck resulted in restricted range of motion. (R. at 313-16.)  Dr. Fisher also

reported that Plaintiff has absent biceps reflex on the right side compared with the left and

decreased sensation over the lateral aspect of his arm and forearm on the right side. (*Id*.)  Dr.

Fisher opined that Plaintiff had reached MMI with regard to the left shoulder, but that he had not

reached MMI with regard to his neck and its herniated discs. (*Id.*)  Dr. Fisher agreed with the

additional treatment recommendations proposed by Plaintiff's treating physicians. (*Id.*)  As to

functional limitations, Dr. Fisher opined that Plaintiff would require  "light duty status . . . work

that does not require him to work overhead with his left upper extremity, and no lifting or

carrying objects over 5-10 pounds frequently . . . and 15-20 pounds occasionally with the left

upper extremity." (*Id.*)

### C. Nasimullah Rehmatullah, M.D.

On August 28, 2003, examining physician, Dr. Rehmatullah, reported that conservative

treatment with epidural blocks had failed to relieve the pain from the multiple cervical disc

herniations, and Plaintiff was reportedly awaiting surgery. (R. at  325-28.)  Examination revealed

moderate spasm in the neck, with approximately 50% mobility. (*Id.*)  Overhead mobility of the

right arm was full. (*Id.*)  There was about 90° of forward elevation on the left side with side

abduction with moderate pain and crepitus. (*Id.*)  Plaintiff reported right arm numbness. Reflexes

were 1 +, and grip strength was good bilaterally. (*Id.*)  Dr. Rehmatullah opined that Plaintiff had

not yet reached MMI.  He recommended that Plaintiff should not perform repetitive movements

with his left arm, perform repetitive movements of his neck, use his left arm in an overhead

fashion, lift over 20 pounds, or perform repetitive or sustained lifting. (*Id.*)  Dr. Rehmatullah did

not believe Plaintiff could return to his previous employment: "He can only do clerical work at

11

this time." (*Id.*)

### OHIO BUREAU OF DISABILITY DETERMINATION (BDD) PHYSICIANS

### Gerald Klyop, M.D.

State agency reviewing physician, Dr. Klyop, reported on February 2, 2004, that Plaintiff had the capacity to occasionally lift or carry twenty pounds, to frequently lift or carry ten pounds, to stand, walk or sit approximately six hours out of an eight hour day, and his push/pull capacity was unlimited. (R. at 362-66.)  Dr. Klyop also opined that Plaintiff was never to climb ladders, ropes, or scaffolds, but could occasionally climb a ramp or stairs,  balance, stoop, kneel, crouch and crawl. (*Id.*)  Plaintiff's gross manipulation was unlimited.  Reaching in all directions (including overhead), fine manipulation and feeling were all limited. (*Id*.)

### Robert Thompson, M.D.

Dr. Thompson, initially evaluated Plaintiff on March 20, 2002, at the request of Dr. Kimberly. (R. at 233-34.)  Examination revealed some diminished range of motion of the cervical spine in all directions, slight biceps weakness on the right, and an absent right biceps reflex. (*Id.*)  Plaintiff's medications included Theragram, Cozaar, Vicodin, and Xanax. (*Id*.)  Dr. Thompson diagnosed disc herniations at C3-4, centrally,  C5-6 to the right and C6-7 to the left. (*Id.*)  Dr. Thompson recommended EMG studies, Prednisone and physical therapy, he noted that if Plaintiff did not respond to conservative care, surgery may eventually be necessary. (*Id.*)

Dr. Thompson examined Plaintiff a second time for the state agency on September 20, 2006. (R. at 606-12.)  Plaintiff reported that he lived alone, did light cleaning, did yard work slowly, cooked, shopped, did the laundry, drove, and visited his mother.  (*Id*.)  Examination of the right upper extremity revealed slight weakness of the biceps and triceps muscles.  (*Id*.)

12

Examination of the left upper extremity revealed reduced range of motion in all directions. (*Id.*) He had bilateral hand grip weakness. (*Id.*) Range of motion of the cervical spine was significantly reduced in all directions. (*Id.*) Grasping and pinching were abnormal bilaterally, but manipulation and fine coordination were normal. (*Id.*) Dr. Thompson diagnosed residuals of two cervical surgeries for multiple disc herniations, with residual neck stiffness and weakness and numbness in both hands; and residuals of left rotator cuff surgery. (*Id.*) Dr. Thompson opined that Plaintiff would be unable to do any work that required repetitive use of his upper extremities or forceful lifting with his left upper extremity. (*Id.*) Dr. Thompson also opined that Plaintiff could never climb and could occasionally manipulate items, balance, stoop, crouch, kneel, or crawl. (*Id.*) Dr. Thompson also opined that Plaintiff should not work around moving machinery or vibration. (*Id.*) Dr. Thompson concluded that Plaintiff could stand, walk, and sit without restriction. (*Id.*)

**MENTAL IMPAIRMENT**

**A.      Richard Meilander, Ph.D.**

Consulting psychologist, Dr. Meilander, noted on February 16, 2004, that Plaintiff reported that he interacted well with his family, visited his girlfriend, did light housekeeping such as laundry and dishes, went fishing, and shopped. (R. at 329-38.) Plaintiff's affect was constricted. (*Id.*) He stated that he was worried about his upcoming surgery. (*Id.*) His eye contact was fair. (*Id.*) Plaintiff's symptoms included variable appetite; interrupted sleep, primarily due to pain, with daytime naps three to four times per week; crying spells four or five times a month; suicidal ideation; feelings of helplessness, hopelessness and worthlessness; low energy; loss of pleasure in things; and social withdrawal. (*Id.*) He was alert and oriented in three

13

spheres. (*Id.*) His memory for past events was fair, and his memory for present events was good. (*Id.*) Plaintiff performed mental arithmetic quickly and accurately, and his powers of abstraction appeared good. (*Id.*) WAIS-III testing revealed a verbal IQ score of 82, a performance IQ score of 75 and a full-scale IQ score of 77. (*Id.*) Dr. Meilander diagnosed Plaintiff with major depression, severe without psychotic features, and borderline intellectual functioning. (*Id.*) Dr. Meilander assigned Plaintiff a Global Assessment of Functioning (GAF) score of 50. (*Id.*) Dr. Meilander opined that Plaintiff's ability to relate to others was moderately to markedly impaired. (*Id.*) Dr. Meilander concluded that Plaintiff was slightly impaired in his ability to understand and follow directions; moderately impaired in maintaining attention to perform, simple, repetitive tasks; and, markedly to severely impaired in dealing with normal work stress and pressures. (*Id.*)

### B. Vicki Casterline, Ph.D.

State agency reviewing psychologist, Dr. Casterline, reported on May 10, 2004, that Plaintiff had moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and had no episodes of decompensation. (R. at 443–58.) Dr. Casterline opined that Plaintiff had adequate persistence and pace for simple tasks, and adequate attention and concentration for one to two-step tasks, and he would be able to perform jobs that did not require constant public interaction, and could get along with supervisors and co-workers. (*Id.*) Dr. Casterline noted that Plaintiff "was very pre-occupied with his upcoming surgery" prior to his consultive examination. (*Id.*) She gave considerable weight to Dr. Meilander's assessment given that Plaintiff was not treating with his own psychologist. (*Id.*) In August 2004, another state agency psychologist, reviewed Plaintiff's records and

affirmed Dr. Casterline's assessment. (R. at  443.)

### C.    Barbara St. Clair, M.Ed., L.P.C.C.

On August 4, 2004, Plaintiff saw counselor,  Ms. St. Clair. (R. at  357-58.)  Plaintiff reported that he wanted to have "someone to talk to & get out of this rut." (*Id.*)  He also reported that Xanax and pain medication he was taking were not working as well as they had in the past. (*Id.*)  Ms. St. Clair reported that Plaintiff was oriented and his affect was depressed. (*Id.*) Plaintiff denied suicidal and homicidal ideation. (*Id.*)  Plaintiff's thoughts were relevant and coherent and there was no evidence of psychosis. (*Id.*)  Plaintiff completed portions of the examination with good concentration. (*Id.*)  Ms. St. Clair diagnosed Plaintiff with adjustment disorder and depression.  She assigned Plaintiff a GAF score of 62. (*Id.*)  On August 19, 2004, Ms. St. Clair found Plaintiff's affect was initially blunted, but then relaxed. (R. at 355-56.) Plaintiff's speech was well thought out but vague at times. (*Id.*)  Plaintiff's case was terminated on December 20, 2004, due to lack of contact for more than 90 days. (R. at 359.)

### IV.  MEDICAL EXPERT TESTIMONY

A medical expert, Richard Hutson, M.D., testified at both hearings concerning Plaintiff's physical limitations. (R. at 663-73; 708-14.)  At the first hearing of May 10, 2006, Dr. Hutson indicated the "vertebrogenic disorder in the cervical spine area... the two fusion surgeries, plus the evacuation of the hematoma in his neck, would fit into the listing . . . 1.04, but he does not have the appropriate loss of neurological function to either meet or equal that listing." (R. at 668.)  Dr. Hutson further testified that an individual needed more than a "partial loss of sensation" to meet Listing 1.04. (R. at 671.)

A supplemental hearing was held on June 12, 2007, at which Dr. Hutson again testified.

15

He indicated that based on his review, Plaintiff had vertebrogenic disorder in the cervical spine, but that based upon the objective medical evidence of record, Plaintiff did not meet or equal listing 1.04. (R. at 708-11.)  To meet Listing 1.04, "You almost essentially have to have a paralysis of certain muscles and complete loss of reflexes and complete loss of sensation in the appropriate distribution in the upper extremity." (R. at 712.)

## V.   THE ADMINISTRATIVE DECISION

On August 11, 2008, the ALJ issued his Decision, which contained the following findings of fact and conclusions of law:

1.      The claimant last met the insured-status requirements of the Social Security Act on December 31, 2006. (Citation to record omitted).

*        *        *

2.      The claimant did not engage in substantial gainful activity during the period from his alleged disability onset date of October 1, 2001, through his date last insured of December 31, 2006 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

*        *        *

3.      Through the date last insured, the claimant had the following "severe" impairments: chronic left shoulder pain with residuals of left rotator cuff surgery, chronic neck pain with residuals of two cervical surgeries, and a history of depression (20 CFR 404.1520(c)).

*        *        *

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, the so-called "Listing of Impairments" (20 CFR 404.1520(d), 404.1525 and 404.1526).

*        *        *

5.      After careful consideration of the entire record, the undersigned finds that,

16

through the date last insured, the claimant had the residual functional capacity to perform light work, subject to the following limitations: no squatting, crawling, pushing/pulling, or climbing of ropes, ladders or scaffolds; no more than occasional bending or climbing of stairs; no exposure to hazards, such as unprotected heights and moving machinery; no work above shoulder level on the left; no repetitive twisting of the neck; and limited to low stress jobs having no production quotas, which do not require that he maintain concentration on a single task for longer than 15 minutes at a time.

*    *    *

6.    Through the date last insured, the claimant was unable to perform his past relevant
      work (20 CFR 404.1565).

*    *    *

7.    The claimant was born on May 10, 1959, and was 42 years old on the alleged disability onset date of October 1, 2001, and 47 years old on his date last insured of December 31, 2006. At either age, he is considered to be a "younger individual," age 18-49 (20 CFR 404.1563).

*    *    *

8.    The claimant has a tenth-grade or "limited" education and is able to communicate in English (20 CFR 404.1564).

*    *    *

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not he has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

*    *    *

10.   Through the dated last insured, considering his age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

*    *    *

11.   The claimant was not under a disability, as defined in the Social Security Act, at

17

> any time from October 1, 2001, the alleged disability onset date, through
> December 31, 2006, the date last insured (20 CFR 404.1520(g)).

(R. at 46-60.)

## VI.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C.

§ 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"take into account whatever in the record fairly detracts from [the] weight" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial

evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and
where that error prejudices a claimant on the merits or deprives the claimant of a substantial
right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th
Cir. 2007)).

## VII.  ANALYSIS

Plaintiff advances three arguments in support of his assertion that the decision of the
Commissioner denying benefits should be reversed. First, Plaintiff contends that the ALJ's
conclusion that Plaintiff's mental impairment does not meet or medically equal Listing 12.04
related to his psychological impairment is in error.  Plaintiff further contends that the ALJ failed
to consider the combination of his impairments in concluding that Plaintiff did not meet or
medically equal Listing 1.04.  Finally, Plaintiff argues that the ALJ erred by giving the most
weight to the medical expert at the hearing, Dr. Hutson.

This Report and Recommendation addresses each argument separately.

**A.      Evaluation of Plaintiff's Mental Impairments**

As his first assignment of error, Plaintiff asserts that the ALJ inappropriately determined
that his mental impairment did not meet or equal Listing 12.04.  If the symptoms, signs, and
laboratory findings of a claimant's impairments are equivalent in severity to those of a listed
impairment, the claimant will be found disabled. 20 C.F.R. § 404.1529(d)(3).

The Commissioner has established a five-step sequential evaluation process for disability

determinations.[1]  20 C.F.R. § 404.1520; *Hensley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009).  If

the Commissioner determines that a claimant is or is not disabled at any step, the Commissioner

makes a determination or decision and does not proceed to the next step.  20 C.F.R. §

404.1520(a)(4).  If the claimant has a severe impairment, at the third step, the impairment is

compared with the Listing of Impairments, 20 C.F.R., Part 404, Subpart P, Appendix 1.  If the

impairment is listed or is medically equivalent to a listed impairment, the claimant is found

disabled and benefits are awarded. 20 C.F.R. § 404.1520(d).

A claimant's impairment must meet every element of a Listing before the Commissioner

may conclude that he or she is disabled at step three of the sequential evaluation process.  *See* 20

C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir.

1986).  The claimant  has the burden to prove that all of the elements are satisfied.  *King v. Sec'y*

---

[1]Section 404.1520 sets forth the five steps as follows:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 404.1560(b).)

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 404.1560(c).)

20 C.F.R. § 404.1520(a)(4).

*of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).  The regulations provide that in

making a medical equivalence determination, the Social Security Administration will "consider

the opinion given by one or more medical or psychological consultants designated by the

Commissioner."  20 C.F.R. § 404.1526(c).  Nevertheless, "[t]he burden of providing a . . . record

. . . complete and detailed enough to enable the Secretary to make a disability determination rests

with the claimant."  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.

1986).  It is not sufficient to come to close to meeting the conditions of a Listing.  *See, e.g.*,

*Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where

medical evidence "almost establishes a disability" under Listing).

Listing 12.04 covers affective disorders, "[c]haracterized by a disturbance of mood,

accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. § 404, Part 404,

Subpart P, Appx. 1 ("Listing 12.04".)[2] In order to meet Listing 12.04 for affective disorders, a

plaintiff must satisfy the diagnostic description in the introductory paragraph of the listing, as

well as paragraph A and either paragraph B or paragraph C.  *Id.*

Plaintiff maintains if the ALJ had properly evaluated his mental impairments, as

diagnosed by the state agency examining and reviewing psychologists of record, he would have

concluded that Plaintiff's conditions satisfied Listing 12.04 for affective  disorders. The

---

[2]A depressive syndrome is characterized by medically documented persistence of at least four of the following: (a.) Anhedonia or pervasive loss of interest in most activities; (b.) Appetite disturbance with change in weight; (c.) Sleep disturbance; (d.) Psychomotor agitation or retardation; (e.) Decreased energy; (f.) Feelings of guilt or worthlessness; (g.) Difficulty concentrating or thinking; (h.) Thoughts of suicide; or (i.) Hallucinations, delusions, or paranoid thinking. Listing 12.04 (A)(1)(a)-(h).  As required by subsection (B), the presence of such characteristics must result in at least two of the following marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or episodes of decompensation, each of extended duration.  Listing 12.04(B).

undersigned disagrees and concludes that the ALJ did not commit error with respect to his

evaluation of Plaintiff s mental impairment.

Plaintiff must show that his impairments meet all of the criteria in Listing 12.04. *See*

*Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). "An impairment that manifests only some of those

criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530.  Similarly, to show

that he equals a listed impairment, Plaintiff must "present medical findings equal in severity to

*all* the criteria for the one most similar listed impairment." *Zebley*, 493 U.S. at 531.  It is not

enough for Plaintiff to show that the overall functional impact of his impairment is as severe as

that of an impairment in the Listings.  *See Zebley*, 493 U.S. at 531.

Plaintiff, in particular, takes issue with the ALJ's analysis at Step 3 related to her

determination that his impairments did not meet or equal the requirements of a listed impairment.

Given the potentially dispositive nature of the Listings, Plaintiff had much to prove at Step 3.

The Supreme Court explains the burden this way:

> The Secretary [now, the Commissioner] has set the medical criteria
> defining the listed impairments at a higher level than the statutory standard.  The
> listings define impairments that would prevent an adult regardless of his age,
> education, or work experience, from performing *any* gainful activity, not just
> 'substantial gainful activity.'...  The reason for this difference between the
> listings' level of severity and the statutory standard is that ... the listings were
> designed to operate as a presumption of disability that makes further inquiry
> unnecessary.  That is, if an adult is not actually working and his impairment
> matches or is equivalent to a listed impairment, he is presumed unable to work
> and is awarded benefits without a determination whether he actually can perform
> his own prior work or other work.

*Zebley*, 493 U.S. at 532 (internal citations omitted).

In challenging the ALJ's finding, Plaintiff contends that he met the "A criteria" of Listing

12.04, and that the ALJ's evaluation of the "B criteria" of Listing 12.04 was not supported by the

record, in light of the psychological limitations Drs. Casterline or Meilander identified.[3] Plaintiff

submits that his condition meets paragraph A of the listing. He did not, however, satisfy

paragraph B, and, therefore, his impairment did not satisfy the severity component of the Listing.

The ALJ specifically found that Plaintiff did not meet the requisite B criteria. This finding is

fully supported by substantial evidence of record. (Tr. 55).The ALJ considered all of the

evidence and reasonably determined Plaintiff had a history of depression and found that Plaintiff

is not "markedly" impaired in any major mental functioning domain. (R. at 52-54.) As noted

above, Dr. Meilander opined that Plaintiff's ability to relate to others was moderately to

markedly impaired; his ability to understand and follow directions was slightly impaired; his

ability in maintaining attention to perform, simple, repetitive tasks was moderately impaired; and

his ability in dealing with normal work stress and pressures was markedly to severely impaired.

(R. at 329-38.) Dr. Casterline noted that Plaintiff "was very pre-occupied with his upcoming

surgery" prior to his consultive examination. (R. at 443-58.) She gave considerable weight to

Dr. Meilander's assessment because Plaintiff did not have his own treating source. Dr. Casterline

opined that Plaintiff had moderate limitations in activities of daily living, maintaining social

functioning, and maintaining concentration, persistence or pace, and had no episodes of

decompensation. (*Id.*) In making these determinations, contrary to Plaintiff's contentions, the

ALJ did not disregard the opinions of Dr. Meilander and Dr. Casterline. (R. at 56.)

Moreover, even though Plaintiff has been diagnosed with borderline intellectual

functioning, he has not shown that the this diagnoses, or any mental health source opinions,

---

[3]As noted above, Listing 12.04 also contains paragraph C criteria. Plaintiff, however, Plaintiff
does not suggest that his condition satisfies those criteria.

should have led the ALJ to find that he met or equaled Listing 12.04.  A mere diagnosis alone does not necessitate a finding of disability.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *see also Young v. Secretary of HHS*, 925 F.2d 146, 151 (6th Cir. 1990)("a claimant must do more to establish a disabling mental impairment than merely show the presence of a dysthymic disorder."); *Kennedy v. Astrue*, 247 Fed.Appx. 761, 767 (6th Cir. 2007)("mere diagnosis of obesity does not establish either the condition's severity or its effect on [the claimant's] functional limitations.").

Plaintiff met part A of Listing 12.04 because the evidence showed he had depression. Plaintiff, however, failed to satisfy the criteria set out in subsection B of Listing 12.04. To satisfy the B requirements of Listing 12.04, Plaintiff had to establish at least two of the following limitations: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *See* Listing § 12.04B, 20 C.F.R. Part 404, Subpart P., Appx, 1.

The ALJ reasonably found that Plaintiff did not satisfy the B criteria of Listing 12.04. (R. at  55-56.)  Because of his mental condition, Plaintiff experienced few restrictions in the activities of daily living.  He lived independently and is able to do necessary household chores, including shopping at the grocery and the drug store, doing laundry, and preparing simple meals. (R. at 656-60.)  He testified that he drives a little each day. (R. at 643, 692.)  Plaintiff spent time with family, friends and his girlfriend and attended holiday meals and other gatherings. (R. at 147, 606.)  He also reported attending church, eating out and fishing. (R. at 151, 657, 659.)

24

The ALJ also reasonably found Plaintiff had mild difficulties in maintaining social functioning. (R. at 55.) After examining Plaintiff, Dr. Meilander reported that Plaintiff related fairly well during his examination and had no history of difficulties relating to others in work settings. (R. at 333.) In addition, the record reveals that Plaintiff was pleasant and cooperative. *See* R. at 323, 330, 333, 371-72, 375-76, 384, 387, 392-94, 396, 400, 402-03, 405, 407, 410-12. Moreover, the ALJ reasonably found Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. (R. at 55.) Plaintiff maintained satisfactory attention and concentration during an interview, and was able to understand and follow directions. (R. at 334.) Dr. Casterline opined that Plaintiff had no more than moderate limitations in this area. (R. at 453.)

Lastly, the ALJ reasonably determined that there is no evidence in the record that Plaintiff experienced episodes of decompensation. (R. at 55.) Plaintiff lived independently and drove a car and made recurrent visits to friends and family members. (R. at 643, 656-60, 692.)

Plaintiff contends that his combined mental impairments, including borderline intellectual functioning, equaled the severity listing of 12.04. His position, however, fails for the reasons already discussed above, namely Plaintiff's impairments in combination did not equal Llisting 12.04 because he did not have marked limitations in two areas. 20 C.F.R. Part 404, Subpart P., Appendix 1 § 12.04B. Further, Dr. Casterline specifically addressed whether Plaintiff's combined mental impairments, including his borderline intellectual functioning, equaled a listed impairment, and found that they did not (R. at 443, 447). Another state agency psychologist also reviewed the records and agreed with Dr. Casterline's assessment that Plaintiff's mental impairments, including his borderline intellectual functioning, did not equal a

25

listing (R. at 443). Further, Plaintiff has adduced no evidence to contradict these medical

opinions. See 20 C.F.R. § 404.1527(f)(2)(i) (explaining that state agency physicians are highly

qualified physicians who are also experts in social security disability evaluation).

  In summary, Plaintiff suffers from depression, but it does not significantly limit his

physical or mental ability to do basic work activities.  Substantial evidence supports the ALJ's

determination as it relates to the severity of Plaintiff's mental impairment and the finding that

Plaintiff mental impairments did not meet or equal Listing 12.04.

**B.**  **Consideration of Impairments in Combination**

  Plaintiff next asserts as error that the ALJ in this case failed to consider Plaintiff's

various impairments in combination.  Specifically, Plaintiff argues that both Plaintiff's cervical

spine disorder and left shoulder pain produce limited range of motion, limited upper extremity

strength, pain and discomfort. *See* Doc. 11 at 16.

  "The Social Security Act requires the Secretary [now, the Commissioner] to consider the

combined effects of impairments that individually may be nonsevere, but which in combination

may constitute a medically severe impairment or otherwise evince a claimant's disability.  42

U.S.C. §423(d)(2)(C)."  *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).  The ALJ's decision

complied with this statutory mandate.

  At step 2 of his sequential analysis, the ALJ found that Plaintiff suffered from multiple

severe impairments including, "chronic left shoulder pain with residuals of left rotator cuff

surgery, chronic neck pain with residuals of two cervical surgeries, and a history of depression."

(R. at 46.)  The ALJ then concluded at step 2 that "[t]hest impairments prevented the claimant

from performing the full range of work related activities, such as lifting heavy weights,

frequently bending or performing other than low stress work.  As the claimant's ability to perform basic work activities was significantly limited by these impairments, they are found to have been "severe" within the meaning of the Social Security Act." (R. at 53-54.)  The ALJ's consideration of multiple severe impairments and his use of the plural "impairments" strongly indicates his consideration of Plaintiff's impairments in combination.

At step 3, the ALJ determined that Plaintiff "did not have an impairment or *combination of impairments* that met or medically equaled one of the listed impairments..." (R. 54.)(emphasis added).  This conclusion establishes that the ALJ considered the combined impact of Plaintiff's impairments on his work abilities not only because the ALJ plainly referred to the "combination of impairments" – plural – but also because he reached this conclusion as part of his consideration of the medical evidence of record concerning Plaintiff's multiple impairments (both physical and mental), together with Plaintiff's testimony during the administrative hearing, *See* Tr. 54-55; *see also Foster*, 853 F.2d at 490; *cf. Loy v. Secretary of Health and Human Services*, 901 F.2d 1306, 1310 (6th Cir. 1990)(ALJ's specific reference to the claimant's "combination of impairments" at step 3 satisfied the ALJ's duty to consider the combined impact of impairments.). An administrative law judge need not articulate all of his or her thought processes where the decision, at least by way of implication, indicates that he or she did in fact consider the combination of the claimant's impairments. *See Gooch v. Secretary of Health & Human Services,* 833 F.2d 589, 591 (6th Cir. 1987). *See also Foster*, 853 F.2d at 490.  For these reasons, the undersigned finds no merit to Plaintiff's second assignment or error.

27

C.      **Consideration and Weight Afforded to Medical Expert**

Finally, Plaintiff contends that the ALJ erred by relying on the medical expert's testimony provided by Dr. Hutson when according to Plaintiff, the medical expert gave a selective review of the record.

The Commissioner views non-treating medical sources, such as medical experts "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id*. at *2-*3.  The Regulations explain that "[i]n deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.1527(f); *see also* Ruling 96-6p at *2-*3.

Listing 1.04A addresses disorders of the spine (such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fracture) resulting in compromise of a nerve root or th spinal cord, with:

> A.      Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A

The ALJ determined that Plaintiff's conditions did not meet or equal Listing 1.04(A).  (R. at 54.)  The record reveals that, although Plaintiff had a medically documented cervical spine disorder, the medical evidence did not demonstrate that Plaintiff satisfied all of the Listing criteria. Although some of the findings required by the listing are present, the record does not contain any evidence related to the requisite of "motor loss (atrophy with associated muscle weakness or muscle weakness)". 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A.

Plaintiff contends the ALJ erred by giving the most weight to the opinion of the medical expert who testified at the administrative hearing, Dr. Hutson, when, according to Plaintiff, Dr. Hutson testified to a "misleading interpretation of the Listing...." *See* Doc. 11 at 17.

When asked what would be required to meet or equal listing 1.04, Dr. Hutson testified as follows:

> You almost essentially have to have a paralysis of certain muscles and complete loss of reflexes and complete loss of sensation in the appropriate distribution in the upper extremity. Excuse me.  Dr. Thompson is a neurologist. A neurologist normally examines the sensation in the extremities including light touch and pinprick and that was not even mentioned in this record.

(R. at 712.)  Plaintiff argues that Dr. Hutson's opinion is misleading because did not have all the medical evidence in his notes. To the extent Plaintiff contends that the medical expert was missing information, the record does not bear out his contention.  Dr. Hutson testified that he had all the exhibits contained in the transcript.  (R. at 708.)   Furthermore, Dr. Hutson testified at both hearings that he had all the exhibits. (R. at  671, 708.)  The ALJ had no reason to believe Dr. Hutson did not review the record.  Merely because Dr. Hutson testified that the record contained "no loss of neurological function" does not automatically compel the conclusion that

29

he had not reviewed the medical evidence.[4]The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the administrative law judge, a who is not a medical professional, may understand. *See, Richardson v. Perales,* 402 U.S. 389, 408 (1972). The Commissioner's regulations provide that an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. § 404.1527(f)(2)(iii).

The record shows that Dr. Hutson considered all of the pertinent medical evidence over the relevant time period in conjunction with Plaintiff's testimony of his activities. (R. at 664-68; 709-13.)  For example, Dr. Hutson specifically addressed Dr. White's notation that on October 25, 2005, following Plaintiff's second surgery, Dr. White reported Plaintiff's neurological examination as being normal. (R. at 709.)  Dr. Hutson continued that in December 2006, Dr. White reported that Plaintiff's radiculopathy has been resolved and Plaintiff's neurological examination was again reported as being normal. (*Id.*)

Dr. Hutson testified that when Plaintiff saw Dr. Thompson in September 2006, his gait was normal and that Dr. Thompson described slight weakness of the biceps and triceps muscles on the right side and the grip and fine finger function were normal. (R. at 710.)  Dr. Hutson continued that Dr. Thompson reported the reflexes on the right biceps, triceps and Brachioradialis were absent. (*Id.*)  Dr. Hutson then testified as to Dr. Thompson's functional capacity opinion. (*Id.*)  Dr. Hutson also testified that Dr. Thompson did not include light touch

---

[4]Specifically, Dr. Hutson testified that Plaintiff did not meet or equal the Listing because the evidence revealed that he did not have "the appropriate loss of neurological function . . . in the upper extremities. [Plaintiff has] some weakness here and there . . . ."  (R. at 711.)

and pinprick in his evaluation. (R. at 712.)

In assessing Plaintiff's residual functional capacity , the ALJ gave the most weight to and relied primarily on Dr. Hutson's and Dr. Thompson's opinions concerning Plaintiff's limitations. (R. at 55-56.)  Rather than crediting Dr. Holtzmeier's opinion, the ALJ reasonably placed greater weight on certain non-treating physicians by applying the "specialization" factor permitted by the Regulations.  *See* 20 C.F.R. §404.1527(d)(5) (more weight is generally placed on the opinion of a specialist about medical issues related to his or her specialty than to the opinion of non-specialist).  When summarizing the record, The ALJ explained that Dr. Hutson's specialty is orthopedics (R. at 45), Dr. Thompson's speciality is neurology (R. at 47), which entitle their opinions to greater weight than that of Dr. Holtzmeier, a family practice physician. (R. at 56.)  The ALJ reasonably determined that Dr. Hutson's assessment was more consistent with Plaintiff's self-described activities of daily living, and the opinions of the state agency doctors. (*Id.*)  The ALJ also considered and incorporated the lifting restrictions imposed by Drs. Klyop and Caldwell in assessing Plaintiff's residual functional capacity.  Based on the record as a whole, the ALJ's decision to give the most weight to the opinion of Dr. Hutson is supported by substantial evidence and was not in error.

## VIII.  CONCLUSION

From a review of the record as a whole, the undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner of Social Security's decision be **AFFIRMED.**

31

## IX.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date    August 9, 2010                              _____ /s/ *Elizabeth A. Preston Deavers* _____
                                                     Elizabeth A. Preston Deavers
                                                     United States Magistrate Judge

32